# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**JESSICA GUARNASCHELLI,**

      **Plaintiff,**

                **Case No. 1:25-cv-850**

      v.

                **JUDGE DOUGLAS R. COLE**

**MEDPACE, INC.,**

      **Defendant.**

## OPINION AND ORDER

Defendant Medpace, Inc., moves for partial judgment on the pleadings in this employment discrimination matter. (Doc. 11). Specifically, Medpace contends that (1) the Court must dismiss Count IV of Plaintiff's Complaint (Doc. 1), because Ohio law does not recognize associational disability discrimination claims, and (2) that Plaintiff is precluded from recovering the value of certain unvested stock options. (Doc. 11, #65–72). The Court disagrees on both fronts, so it **DENIES** Medpace's motion.

## BACKGROUND

Dr. Jessica Guarnaschelli, the plaintiff, is a radiation oncologist "with more than twenty years of experience in clinical practice, research, and academia." (Doc. 1, #2). Guarnaschelli has cultivated expertise in the design and management of clinical trials. (*Id.*).

In 2018, Medpace, a publicly traded contract research organization, recruited Guarnaschelli to build a radiopharmaceutical research program. (*Id.* at #3). Before

Guarnaschelli's arrival, Medpace lacked the personnel and know-how necessary to establish such a program, as radiopharmaceuticals were something of a new-fangled approach to cancer treatment at the time. (*Id.*). Guarnaschelli's efforts at Medpace generated substantial revenue for the company. (*Id.* at #3–4). For example, in fiscal year 2024, Medpace's radiopharmaceuticals program generated some $48.8 million in revenue. (*Id.*). And, as of the time of filing, Medpace was allegedly expecting an additional $94.8 million in direct fees. (*Id.* at #4). Guarnaschelli says that, for a time, Medpace adequately compensated her for her contributions to the company. She received, for example, positive feedback, bonuses, and equity grants. (*Id.*). And in 2021, Medpace promoted Guarnaschelli to senior medical director. (*Id.*).

But the parties' relationship began to sour a few years later. On March 28, 2024, Guarnaschelli, a single mother, began an unpaid medical leave to care for her disabled child, who was struggling with disability-related health issues that threatened long-term consequences. (*Id.*). Guarnaschelli alleges that Medpace approved the leave under the Family and Medical Leave Act (FMLA). (*Id.*). Despite that approval, though, Guarnaschelli says that Medpace and its officers were not pleased with Guarnaschelli's time away from work. (*Id.*). The first indication of that came on July 11, 2024, when Guarnaschelli met Dr. Blythe Thomson, Guarnaschelli's direct supervisor, for coffee. (*Id.*). At that meeting, Thomson "made a point of suggesting that … Guarnaschelli's need for medical leave, or at least the duration of it, was not legitimate." (*Id.*).

2

Guarnaschelli returned to work about a month later, on August 5, 2024. (*Id.*). While she retained the same title and salary, Medpace allegedly deprived her of a significant portion of her responsibilities. (*Id.*). For example, before Guarnaschelli took leave, she served as the primary monitor on twelve separate radiopharmaceutical studies. (*Id.* at #4–5). But once she returned, Medpace permitted Guarnaschelli to resume her lead role on only two studies and placed her in a lesser support role on several others. (*Id.* at #5). Medpace also sidelined Guarnaschelli in other ways. Before her leave, Guarnaschelli was the "clear leader" of the radiopharmaceutical program. (*Id.*). But by the time she returned, Medpace had assigned various other radiopharmaceutical projects to directors who lacked relevant experience. (*Id.*). Indeed, one of those directors even expressed regret that Medpace was removing Guarnaschelli "from her role as the leader of the program she worked so hard to build." (*Id.*). Guarnaschelli also endured social slights. For example, Thomson "conspicuously" excluded Guarnaschelli from an invitation to a celebratory dinner for Medpace's oncology group in early September 2024. (*Id.*).

Later that month, Guarnaschelli had a call with Medpace's CEO, Dr. August Troendle, to discuss Medpace's radiopharmaceutical business and Guarnaschelli's place within it. (*Id.*). In Guarnaschelli's view, she was, by that time, "overdue for a promotion to Vice President, at least by the standards that applied to her male peers." (*Id.* at #4). Yet when Guarnaschelli broached the topic of her advancement, Troendle stated unequivocally, "There is no path." (*Id.* at #5). When Guarnaschelli pressed him

3

for an explanation, Troendle responded that Dr. Lyon Gleich, a senior vice president at Medpace, had formed a negative opinion of Guarnaschelli. (*Id.*).

Shortly thereafter, Guarnaschelli raised the issue of her advancement with her direct supervisor, Thomson. (*Id.*). During that exchange, Thomson said that "Troendle doesn't believe we [i.e., Medpace executives] should take care of family at the expense of work," or similar words to that effect. (*Id.* at #5–6). When Guarnaschelli pointed out that Troendle himself had a family, Thomson replied, "He lives in a 1980s world." (*Id.* at #6). Thomson then reassured Guarnaschelli that, if she "kept her head down," she might be promoted after her November 2024 performance review. (*Id.*). With that, Guarnaschelli did her best to focus on her work until November 18, 2024, when she raised the issue with Thomson yet again. (*Id.*). But Thomson was not receptive and allegedly stated, "I'm not putting you up for promotion because you took a medical leave," and further said something to the effect that Medpace leadership expects employees at Guarnaschelli's level "not to have families to care for." (*Id.*). Guarnaschelli followed up with Thomson about a week later via email. (*Id.*). There, she said:

> Also, earlier in the year, you said that I could be put up for promotion. Last Monday, you said that I was unable to be put up for promotion due to the fact that I had to take time away to care for a sick child. Is that still the case?

(*Id.*). Thomson did not deny the assertion and responded with, "Happy to chat about this at your annual performance review." (*Id.*).

Guarnaschelli then reported Thomson's "retaliation" to Medpace's human resources team. (*Id.*). But Adam Busemeyer, Medpace's human resources director,

4

responded by relaying that Thomson denied that Guarnaschelli's FMLA leave precluded a promotion. (*Id.* at #6–7). And in a subsequent meeting that occurred near the end of November 2024, Thomson apologized for giving Guarnaschelli the "wrong impression." (*Id.* at #7). But, according to Guarnaschelli, Thomson in effect doubled down on her earlier position in that very meeting. (*Id.*). She explained that Guarnaschelli's leave prevented her from meeting her annual revenue goals, which were necessary for promotion. (*Id.*). Put another way, "Thomson admitted that Medpace held Dr. Guarnaschelli to a full year revenue goal, even though she had worked meaningfully less than a full year due to her FMLA leave." (*Id.*).

On December 5, 2024, Guarnaschelli met with Busemeyer and Erin Bricker, another human resources representative, to further discuss Guarnaschelli's retaliation concerns. (*Id.*). And in an email summarizing the meeting, Bricker restated Thomson's view that Guarnaschelli was ineligible for promotion because her leave prevented her from meeting "several objectives related to revenue." (*Id.*).

Following Guarnaschelli's final round of complaints to human resources, Medpace made it clear that Guarnaschelli did not have a future at the company. (*Id.*). In January 2025, Medpace initiated three significant radiopharmaceutical studies. (*Id.*). Ordinarily, Guarnaschelli—Medpace's only radiation oncologist—would be named the primary medical monitor. (*Id.* at #7–8). Yet Medpace assigned each trial to other executives. (*Id.* at #8). Right around the same time, Guarnaschelli encountered Gleich, the senior vice president, in the hallway at Medpace. (*Id.*). He allegedly "stopped, looked at her, and cryptically said, 'Good luck,' as though this was

the last time he would see her." (*Id.*). Later that month, a Medpace medical director stopped by Guarnaschelli's office and said, "I'm so glad you are still here. I had called you and was going to stop by your house because I thought you had been fired. We just want you to be steady and stable." (*Id.*).

Finally, on February 4, 2025, Medpace summoned Guarnaschelli to a meeting with Amy Callow, Medpace's vice president of human resources, and Dr. Reinilde Hyrman, Medpace's chief medical officer. (*Id.*). There, Callow told Guarnaschelli that Medpace had terminated Guarnaschelli's at-will employment. (*Id.*). Callow explained, "We did not think you were meeting the expectations of a medical monitor." (*Id.*). That explanation was in some tension with Guarnaschelli's recent performance review, which made no mention of performance concerns and evaluated Guarnaschelli favorably. (*Id.*).

Based on those allegations, Guarnaschelli sued on November 19, 2025, asserting six counts: (1) FMLA retaliation based on her medical leave, (2) FMLA retaliation based on her decision to report her concerns to human resources, (3) disability discrimination under the Americans with Disabilities Act (ADA), (4) disability discrimination under Ohio's unlawful discriminatory practices statute, (5) gender discrimination under Title VII, and (6) gender discrimination under Ohio's unlawful discriminatory practices statute. (*Id.* at #8–12). Guarnaschelli seeks, among other relief, damages. (*Id.* at #12). And that request includes, among other things, "compensation for all lost stock grants and other equity-based considerations." (*Id.*).

That last part is what forms one basis for Medpace's motion for partial judgment on the pleadings here. Medpace contends that Guarnaschelli is not entitled to any damages based on her lost equity compensation because her stock options had not vested at the time she was terminated on February 4, 2025. (Doc. 11, #70–71). In support, Medpace cites the parties' Stock Option Grant Notice and Stock Option Agreement (the Agreement). (*Id.*; *see* Doc. 9-1 (stock option agreement)). The Agreement provides that Guarnaschelli's right to exercise the stock options is "[s]ubject to [Guarnaschelli's] continued employment with or service to [Medpace] on each applicable vesting date." (Doc. 9-1, #55). Paragraph 3.1(b) of the Agreement further states:

> Unless otherwise determined by the Administrator or as set forth in a written agreement between Participant and the Company, any portion of the Option that has not become vested and exercisable on or prior to the date of Participant's Termination of Service (including, without limitation, pursuant to any employment or similar agreement by and between Participant and the Company) shall be forfeited on the date of Participant's Termination of Service and shall not thereafter become vested or exercisable.

(*Id.*). And the Agreement also purports to waive any "claim or entitlement to compensation or damages" arising out of the forfeiture of the option:

> [I]n consideration of the grant of the Option hereunder, no claim or entitlement to compensation or damages arises from termination of the Option, and no claim or entitlement to compensation or damages shall arise from forfeiture of the Option resulting from termination of Participant's employment by any Company Group Member or any affiliate thereof (for any reason whatsoever and whether or not in breach of local labor laws) and Participant irrevocably releases each Company Group Member from any such claim that may arise; if, notwithstanding the foregoing, any such claim is found by a court of competent jurisdiction to have arisen, Participant shall be deemed irrevocably to have waived Participant's entitlement to pursue such claim.

(*Id.* at #57). Thus, Medpace says, because Guarnaschelli's "stock options never vested and were forfeited, [she] agreed that no claim or entitlement to compensation or damages can arise from forfeiture of the options resulting from her termination of employment for any reason." (Doc. 11, #71).

Separately, Medpace contends that Guarnaschelli's fourth count—disability discrimination under Ohio law—fails as a matter of law because Ohio does not recognize associational disability claims. (*Id.* at #65–70).

Guarnaschelli has responded, (Doc. 14), and Medpace has replied, (Doc. 15). So the matter is ripe for review.

### LEGAL STANDARD

When a defendant seeks judgment on the pleadings under Federal Rule of Civil Procedure 12(c), the analysis "generally follows the same rules as a motion to dismiss the complaint under Rule 12(b)(6)." *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 480 (6th Cir. 2020) (citation omitted). To survive a motion to dismiss under Rule 12(b)(6), in turn, a plaintiff must allege "sufficient factual matter ... to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). While a "plausible" claim for relief does not require a showing of probable liability, it requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* The complaint must allege sufficient facts for the Court "to draw the reasonable inference that the defendant is liable." *Id.* In determining whether the allegations meet that standard, the Court "construe[s] the complaint in the light most favorable to the plaintiff, draw[s] all reasonable inferences in [her]

favor, and accept[s] all well-pleaded allegations in the complaint as true." *Keene Grp., Inc. v. City of Cincinnati*, 998 F.3d 306, 310 (6th Cir. 2021). But that does not mean the Court must take the allegations as gospel, no matter how unsupported they are. The Court may disregard "naked assertions" of fact or "formulaic recitations of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (cleaned up).

In other words, a plaintiff must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012) (quoting Fed. R. Civ. P. 8(a)(2)). To meet this pleading standard, a complaint must contain "either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 275–76 (6th Cir. 2010) (quotation omitted). And "conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Id.* at 276 (quotation omitted). In short, a court will dismiss an action when "there is no law to support the claims made" or "the facts alleged are insufficient to state a claim." *Stew Farm, Ltd. v. Nat. Res. Conservation Serv.*, 967 F. Supp. 2d 1164, 1169 (S.D. Ohio 2013) (citation omitted).

That said, deciding Medpace's motion requires the Court to consider the Agreement, which Medpace has attached to its answer. (*See* Doc. 9-1). While a court's review on a Rule 12(c) motion is confined to the "pleadings," "an attachment to an answer that is a 'written instrument' is part of the pleadings and can be considered … without the motion being converted to one for summary judgment." *Doe v. Belmont Univ.*, 334 F. Supp. 3d 877, 887 (M.D. Tenn. 2018) (citations omitted). In

9

other words, "the Rule 12(b)(6) incorporation by reference doctrine [applies] in Rule 12(c) cases as well." *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). Thus, "as long as [an attachment to an answer is] central to the plaintiff's claim and of undisputed authenticity," a court may consider the attachment. *Doe*, 334 F. Supp. 3d at 887 (citations omitted). Here, the Agreement is central to Guarnaschelli's claims because it appears to be the document that gives rise to her prayer for damages based on her lost equity compensation. (*See* Doc. 1, #12). And neither party disputes the Agreement's authenticity. So the Court will consider the Agreement in resolving Medpace's motion.

## LAW AND ANALYSIS

**A.    The Sixth Circuit Has Predicted that the Ohio Supreme Court Would Recognize Associational Disability Discrimination Claims, and that Ruling Binds this Court.**

Start with Count IV of Guarnaschelli's Complaint. Medpace cites a bevy of federal cases for the proposition that Ohio's unlawful discriminatory practices statute, Ohio Revised Code § 4112.02, does not create a claim for associational disability discrimination. (Doc. 11, #66–67 (collecting cases)). Guarnaschelli, on the other hand, points to the Sixth Circuit's recent decision in *Chapman v. Brentlinger Enterprises*, 124 F.4th 382 (6th Cir. 2024), which, she says, predicted that the Ohio Supreme Court would recognize associational disability claims under the statute if the issue were squarely presented. (Doc. 14, #183). Based on *Chapman*, Guarnaschelli argues that her state-law associational disability claim may proceed. (*Id*. at #184). The Court agrees with her.

10

Under Ohio Revised Code § 4112.02(A), it is unlawful for "any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause … or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." In *Chapman*, the Sixth Circuit relied on two Ohio cases—*Ohio Civil Rights Commission v. Lysyj*, 313 N.E.2d 3 (Ohio 1974), and *Cole v. Seafare Enterprises Limited, Inc.*, No. C-950157, 1996 WL 60970 (Ohio Ct. App. Feb. 14, 1996)—to predict that, if presented with the issue, the Ohio Supreme Court would interpret § 4112.02(A) to cover associational disability claims. *Chapman*, 124 F.4th at 406.

To explain that a bit more fully, in *Lysyj*, the Ohio Supreme Court held that § 4112.02(G), a separate provision in the unlawful discriminatory practices statute that bans discrimination in public accommodations, provides a cause of action for associational race discrimination claims. 313 N.E.2d at 6. Then *Cole*, taking a similar tack, extended *Lysyj*'s holding to associational race discrimination claims under § 4112.02(A). 1996 WL 60970, at *2. *Chapman* then concluded that, while *Lysyj* and *Cole* "involved allegations of race discrimination … the rules they announced apply to §§ 4112.02(A) and (G) generally, which include 'disability' among the protected characteristics." 124 F.4th at 406 (citations omitted). So, the Sixth Circuit said, plaintiffs may assert associational disability discrimination claims under § 4112.02(A), notwithstanding some earlier unpublished Sixth Circuit and district court caselaw that held to the contrary. *Id.* at 406–07.

11

*Chapman* presents an insurmountable hurdle for Medpace's argument here. That is because, "when a panel of [the Sixth Circuit] has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit." *Rutherford v. Columbia Gas*, 575 F.3d 616, 619 (6th Cir. 2009) (quoting *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)). So *Chapman* binds this Court.

Medpace tries to resist this conclusion by pointing to *Pamias v. DIP Akron, Inc.*, a pre-*Chapman* case in which the Summit County Court of Common Pleas distinguished *Lysyj* and *Cole* and held that § 4112.02 does not apply to associational disability discrimination. No. 2015-02-1082, 2015 Ohio Misc. LEXIS 27081, at *5 (Ct. Com. Pl. Aug. 12, 2015). Medpace accurately observes that *Chapman* did not consider *Pamias*, which might be the only Ohio "decision that *has* directly addressed the issue." (Doc. 11, #68 (emphasis in original)). Medpace then couples its reliance on *Pamias* with *Veritas Independent Partners LLC v. Ohio National Life Insurance Company*, where this Court read *Rutherford* to "imply a rule something like the following: Where an Ohio court (and not necessarily the Ohio Supreme Court) has *either* (1) reached a holding contrary to that of an earlier Sixth Circuit decision; *or* (2) suggested that the Sixth Circuit decision 'misapplied Ohio law,'—a later Sixth Circuit panel may disregard the earlier panel's interpretation of state law." No. 1:18-cv-769, 2021 WL 3046635, at *4 (S.D. Ohio July 20, 2021) (emphasis in original). The Court further explained, "if that is the case, then it would seem that a district court likewise is able to ignore that interpretation. After all, a district court is in much 'the

12

same position' as a three-judge-circuit-court panel with respect to earlier circuit-court precedent." *Id.* (quoting *United States v. Bishop*, 453 F.3d 30, 31 (1st Cir. 2006)). These conclusions found further support in the Sixth Circuit's decision in *Bennett v. MIS Corporation*, 607 F.3d 1076 (6th Cir. 2010), which departed from an earlier Sixth Circuit panel decision construing Michigan law after an intervening decision from a state intermediate court criticized the earlier Sixth Circuit panel decision. *Veritas Ind. Partners*, 2021 WL 3046635, at *4.

This case, however, is entirely different from *Veritas*. Here, unlike *Bennett*, there is no *intervening* state court decision that suggests that *Chapman* misapplied Ohio law. Rather, *Pamias*, an unpublished Ohio trial court decision, and one which as far as the Court can tell, no other court has ever cited, was decided *before Chapman*. So, while *Pamias* might be a relevant data point about the contours of state law if the Court were considering this issue anew, it does not give the Court license to depart from a published Sixth Circuit decision. True, it may be the case that the Sixth Circuit overlooked a relevant (but certainly not controlling) data point. (*See* Doc. 15, #192 (collecting cases for the proposition that federal courts may defer to state trial courts when predicting a state high court's ruling)). But perhaps not. *See Harshaw v. Bethany Christian Servs.*, 714 F. Supp. 2d 751, 758 (W.D. Mich. 2010) ("[T]he federal court is not *obligated* to follow state trial-court decisions." (emphasis in original) (citations omitted)); *cf. King v. Order of United Com. Travelers of Am.*, 333 U.S. 153, 161 (1948) ("[A] Court of Common Pleas does not appear to have such importance and competence within South Carolina's own judicial system that its

13

decisions should be taken as authoritative expositions of that State's 'law.'"). Either way, as the Sixth Circuit decided *Chapman* after *Pamias*, the interaction between the two, if any, is a question for the Sixth Circuit, not this Court.

In sum, *Chapman* controls. Guarnaschelli's state-law associational disability discrimination claim may proceed.

**B. Guarnaschelli Has a Substantive Statutory Right to Pursue Damages Based on Her Lost Stock Options, Which She May Not Prospectively Waive.**

Medpace's second argument—i.e., that Guarnaschelli has contractually waived her right to pursue damages based on lost equity compensation—fares no better.

As a general matter, plaintiffs may pursue lost equity compensation in employment discrimination and retaliation cases. *See Scarfo v. Cabletron Sys., Inc.*, 54 F.3d 931, 955–56 (1st Cir. 1995) (affirming trial court's damages award based in part on "the value of stock options [the plaintiff] would have received if she had not been discriminated against on the basis of sex" in Title VII case); *MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 927 (8th Cir. 2004) (noting jury's $102,000 damages award "for lost stock options" on Title VII discrimination claim); *Greene v. Safeway Stores, Inc.*, 210 F.3d 1237, 1240, 1243–44 (10th Cir. 2000) (concluding that plaintiff could recover damages for "unrealized stock option appreciation" under the ADEA); *Glowacki v. O'Reilly Auto Enters., LLC*, No. 1:21-cv-868, 2023 WL 8642549, at *6–7 (W.D. Mich. Dec. 14, 2023) (declining to disturb jury's $729,000 damages award for stock options that plaintiff "could not exercise … due to his termination" in Title VII

14

retaliation case). Medpace cites no caselaw suggesting that plaintiffs are generally barred from seeking these damages. (*See* Doc. 11, #70–72; Doc. 15, #194–96).

True, the Agreement provides that "no claim or entitlement to compensation or damages shall arise from forfeiture of the Option resulting from termination of Participant's employment." (Doc. 9-1, #57). Here, though, enforcing that limitation would undercut Title VII's remedial goal of "making persons whole for injuries suffered through past discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975). But for Medpace's allegedly wrongful termination, Guarnaschelli's stock options would have vested in March 2026.[1] (*See* Doc. 9-1, #54; Doc. 9-2, #59). And, as Guarnaschelli points out, "the long-term incentive compensation represented by the Stock Option Agreement comprises the largest portion of … Guarnaschelli's compensation from Medpace." (Doc. 14, #188). Thus, "[t]o preclude her from recovering those damages would prevent her from being fully compensated for Medpace's [allegedly] unlawful conduct." (*Id.*).

As the Sixth Circuit has recognized, contractual limitations that force plaintiffs "to for[]go … substantive rights to the full panoply of remedies under Title VII … contravene Congress's intent to utilize certain damages as a tool for compensating victims of discrimination and for deterring employment discrimination more broadly." *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 670 (6th Cir. 2003);

---

[1] The stock options were initially set to vest on October 27, 2025. (Doc. 9-1, #54). But Guarnaschelli and Medpace later agreed to toll the vesting period for the duration of her leave. (Doc. 9-2, #59). Guarnaschelli's leave—which started on March 28, 2024, and ended on August 5, 2024—lasted 130 days (about four months). So, as Medpace observes, the parties' agreement in effect delayed the vesting date from October 27, 2025, to March 6, 2026. (Doc. 15, #196).

*see also Clark v. Ridi Acct., LLC*, No. 3:22-cv-589, 2022 WL 16715470, at *5–6 (N.D. Ohio Nov. 4, 2022) (rejecting limitation contractual limitation on remedies in ADA case).

Admittedly, *Morrison* and *Clark* involved "the arbitrability of federal statutory claims where the arbitration agreements prohibited and/or restricted entire categories of damages that may otherwise be available in a judicial forum." (Doc. 15, #195). And, as Medpace points out, the question here is not "whether Plaintiff would be entitled to the same remedies in arbitration as in a court." (*Id.*).

But, in the Court's view, that is not determinative. While *Morrison* did rely in part on the "well-established" principle that "a party does not forgo the substantive rights afforded by a statute when she agrees to arbitrate a statutory claim but only submits to their resolution in an arbitral, rather than a judicial, forum," the case also generally relied on the remedial and deterrence principles that animate Title VII. 317 F.3d at 670 (cleaned up) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991)). More narrowly, *Morrison* recognized that Title VII plaintiffs have a "substantive right[] to the full panoply of remedies under Title VII." *Id.* And even outside the arbitration context, "this type of substantive right generally is not waivable in advance by employees." *Logan v. MGM Grand Detroit Casino*, 939 F.3d 824, 829 (6th Cir. 2019) (citing *Brooklyn Savs. Bank v. O'Neil*, 324 U.S. 697, 704 (1945)); *see also id.* at 837 ("We held [in *Morrison*] that the provisions in the arbitration agreement that limited Morrison's substantive recovery were unenforceable because they 'significantly undermine[d] Title VII's remedial purpose."

16

(quoting *Morrison*, 317 F.3d at 673)). Thus, because the parties' agreement is "prospectively detrimental to [Guarnaschelli's] substantive rights under federal law," it is unenforceable. *Id.* at 833.

In short, Guarnaschelli may pursue damages based on her unvested stock options.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Medpace's Motion for Partial Judgment on the Pleadings (Doc. 11).

**SO ORDERED.**

June 22, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**